UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/18

CONNIE AVARAS, individually and as parent of N.A.,

             Plaintiffs,

   -against-

CLARKSTOWN CENTRAL SCHOOL DISTRICT,
BOARD OF EDUCATION FOR THE CLARKSTOWN
CENTRAL SCHOOL DISTRICT, and NEW YORK
STATE DEPARTMENT OF EDUCATION,

             Defendants.

No. 15 CV 9679 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Connie Avaras, individually and as parent of N.A., brings this action *pro se* against the Clarkstown Central School District (the "District"), the Board of Education for the District (the "Board") (collectively the "District Defendants"), the New York State Department of Education (the "Department"), and the following Department officials: Mary Ellen Elia, the State Commissioner of Education ("Elia"), Christopher Suriano, the Assistant Commissioner of Special Education ("Suriano"), Joanne LaCrosse, Coordinator of Special Education Policy and Professional Development ("LaCross"), Noel Granger, Supervisor of Program Development and Support Services ("Granger"), and Jackie Bumbalo, Coordinator of Upstate Regional Special Education Quality Assurance ("Bumbalo") (collectively, the "Department Officials" and with the Department, "Department Defendants")[1] pursuant to the Individuals with Disabilities Education

---

[1] The Department Officials were not parties to Plaintiff's original complaint, but were added on February 8, 2017, when Plaintiff filed the SAC.

Improvement Act ("IDEA" or "IDEIA"), 20 U.S.C. § 1400 et seq., Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, Section 504 of the Rehabilitation Act of 1973

("RA"), 29 U.S.C. § 794, and 42 U.S.C. § 1983 ("Section 1983"). Predominantly, Ms. Avaras

seeks judicial review of a decision made by a State Review Officer ("SRO") at the Department,

who affirmed the decision of an Independent Hearing Officer ("IHO"), finding that the District did

not violate its Child Find obligation and offered N.A. a free and appropriate public education for

the 2011-2012 and 2013-2014 school years. Ms. Avaras contends that she is entitled to tuition

reimbursement and transportation expenses for her unilateral alternative. The District counter-

claims for review of the IHO's decision finding that the District failed to provide a free appropriate

public education for the 2012-2013 year and that Ms. Avaras's unilateral alternative was

appropriate. Plaintiff also alleges the Defendants' treatment of N.A. and herself violated the ADA,

RA, and Section 1983.

Before the Court are two motions: (1) District Defendants' motion for summary judgment;

and (2) the Department's motion to dismiss. For the reasons set forth below, the District

Defendants' motion is GRANTED in part and DENIED in part. The SRO's decision is

AFFIRMED in part and REVERSED in part. Plaintiff's claims asserted against the District

Defendants pursuant to the ADA, RA, and Section 1983 are DISMISSED.[2] The Department's

motion is GRANTED and all claims against it and the Department Defendants are DISMISSED.

---

[2] To the extent the District Defendants also argue against Plaintiff's request for tuition reimbursement for the 2014-2015 school year, this Court declines to render a decision on this issue. As indicated in this Court's opinion and order dated August 28, 2018 on Plaintiff's Motion for Pendency, the determination of whether Plaintiff is entitled to tuition reimbursement from the year she filed her due process complaint through the 2017-2018 years under the pendency law, are to be remanded to the IHO for consideration. (*See* ECF No. 77.)

# BACKGROUND

## I.      Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from the proceedings below,[3] which reflect the following factual background.

### A.      Record Adduced at Hearing by the IHO

An independent hearing was held to determine the appropriateness of the education plan provided by the District to N.A., which lasted for 10 days over a period of seven months, beginning on December 13, 2013 and ending on July 23, 2014.  The following nine witnesses testified during the hearings: Arnold Fucci (executive director of pupil services), David Carlson (chairperson on the Committee of Special Education ("CSE")), Lisa Maher (principal of Woodglen Elementary ("Woodglen")), Meredith Grant (school psychologist), Ilene Mirenberg (special education teacher), Suzanne Braniecki, Ph.D. (clinical psychologist), Rhonda Graff (general education teacher), Erin Castle (co-founder and co-director of Hawk Meadow Montessori School("Hawk Meadow")), and Plaintiff.[4]  The Court summarizes the salient portions of the documentary and testimonial evidence below, referring to the IHO's summary and specific record citations as needed.

N.A. was a student at Woodglen, a school within the District, until his parents placed him in an alternative program for his second grade year.  (C.R. 8, 43.)  N.A.'s struggles with reading, decoding, reading comprehension, and math concepts were first noticed by the District in kindergarten.  (C.R. 42-43.)  At that time, he began receiving educational support services in the

---

[3]   The District Defendants' motion for summary judgment was fully briefed as of June 16, 2017, including supplemental briefing.  (*See* Dist. Defs. Mot. (ECF Nos. 43-52.)
[4]   The transcripts of the testimony alone constituted over 1,000 pages.  Additionally, numerous exhibits were presented by the parties and received into evidence.

form of "academic intervention services" ("AIS") and Response to Intervention" ("RTI") services in the form of "Fundations", a researched based reading program beginning in October or November of 2010.  (C.R. 43; C.R. 308 (Fucci).)  Such "building level" services were provided during the regular school day for the majority of N.A.'s kindergarten year.  (C.R. 308-09 (Fucci).)[5]

### 1. 2011-2012: First Grade

As N.A. began his first grade year, the District acknowledged that he was still experiencing educational difficulties, and therefore resumed the RTI services that they were providing to him in kindergarten.  (C.R. 43.)  On September 22, 2011, Plaintiff executed a consent form acknowledging that N.A. would be receiving additional educational support services.  (C.R. 985-86 (D-6).)  RTI services are typically provided on an eight week cycle, after which evaluations and reviews are conducted to ascertain whether a student needs additional or fewer services.  (C.R. 385 (Maher), C.R. 419 (Grant).)  After Tier 3 is implemented, if the review demonstrates that a student is "not meeting needs at that point, the school may make a school referral, and request from the parent consent to evaluate for a full psychoeducation, and make a referral to the Committee on Special Education."  (C.R. 331 (Fucci).)

N.A. continued to receive Tier 3 RTI services for the majority of his first grade year, until in May of 2012, Plaintiff requested that the District perform an evaluation to ascertain whether he would be eligible for special education services.  (C.R. 987 (D-7.)  She thereafter provided consent for the District to perform the requisite evaluation for purposes of the CSE meeting.  (C.R. 988 (D-8).)

---

[5] RTI services were described as comprising three Tiers based on the individual needs of the student.  (C.R. 308.)  Tier 1 is generally provided by a classroom teacher and typically occurs only in the classroom.  (C.R. 396-97.)  Tier 2 usually involves a "support service person" and can also be a "push in" or a "pull out" (push in refers to those instances when a support service person enters the classroom to provide the student additional help, as opposed to "pull out" where the student is pulled out of class to obtain additional help).  (*Id.* at 397.)  Tier 3 is similar to Tier 2, though it is typically much more intensive.  (*Id.*)  In accordance with these parameters, during his kindergarten year, N.A. received Tier 1 and 2 services.  (C.R. 43; 477 (Mirenberg).)

Prior to his evaluation by the District, Plaintiff had N.A. evaluated by Suzanne Braniecki, who specializes in neuropsychology and pediatric psychology. (C.R. 45.) Dr. Braniecki conducted a battery of tests assessing, *inter alia*, N.A.'s levels of verbal functioning, perceptual reasoning, auditory and visual attention, and academic testing. (C.R. 1025-1034 (D-25).) Ultimately, Dr. Braniecki concluded that N.A.'s "neurocognitive profile [was] notable for variable working memory skills, below average visual processing skills and weak reading and writing skills." (C.R. 1032.) Dr. Braniecki noted, *inter alia*, that N.A. would "benefit from a multisensory approach to learning where he receives much support", including 1:1 support services. (C.R. 1033.) Finally, Dr. Braniecki diagnosed N.A. with a learning disability, opining that his symptoms reflected "classic dyslexia." (C.R. 510-11.)

On June 4, 2012, Plaintiff wrote a letter to the District rejecting the RTI services and indicating that they were inappropriate for her son, noting that she reserved the right to place him in private school at the District's expense. (C.R. 643-644 (Plaintiff); 989 (D-10).) The next day, a social history report was prepared, (C.R. 866 (P-O), 997 (D-12)), and the District sent notice of a scheduled CSE on June 6, 2012, (C.R. 991 (D-11).) On June 15, 2012, a classroom observation was conducted to analyze N.A.'s receptiveness in the classroom. (C.R. 48.) The observation revealed that N.A. "appeared distracted" and had difficulty following oral instruction. (C.R. 48; 862 (P-L).)

Carolyn Stimmel, the District psychologist that filled in for Grant while she was on leave, prepared a psychoeducational report following an evaluation of N.A. performed on June 11, 2012. (C.R. 997 (D-12).) Stimmel included the results from Dr. Braniecki's examinations into her evaluation. (C.R. 47.) Stimmel noted that N.A.'s immediate auditory memory was low average, "his scanning speed is significantly below average", as was his ability to read fluently. (C.R.

1002.) Stimmel recommended that the information be shared with the CSE to plan an Individualized Education Plan ("IEP"), and that N.A. would benefit from "extra help sessions", reading practice at home, and consultation services, if necessary. (C.R. 1003.)

Carlson convened a CSE meeting on June 19, 2012 to assess N.A.'s entitlement to special education services based on a potential classification of a learning disability. (C.R. 48.) Mirenberg, Carlson, Maher, Ms. Ritter (who prepared the social history report), and Plaintiff were present at the CSE meeting. (C.R. 49.) The team reviewed data available to them, including, psychoeducational evaluations, the social history, and the reports regarding the classroom observations. (C.R. 48.) As a result of the meeting, the CSE classified N.A. as learning disabled and recommended an IEP which provided for 15:1 special class instruction in English Language Arts ("ELA") and math, along with counseling as a related service. (C.R. 386-87 (Maher).) Plaintiff accepted N.A.'s classification as learning disabled, but rejected the proposed services, as she thought the 15:1 classroom recommendation was too restrictive. (C.R. 371 (Maher).) As a result, the CSE team adjusted the recommendation to add consultant teacher services once per week, and 5:1 resource room in math for 30 minutes daily. (C.R. 371-72 (Maher), 955 (D-3).) Plaintiff again disagreed with this recommendation. (C.R. 50.)

The District also provided Plaintiff with the requisite documentation attendant to the creation of an initial IEP for a student newly classified as learning disabled, including, the Prior Written Notice, Proposed Initial Eligibility for Special Education, and Request for Consent for the parents' signature. (C.R. 50.) The proposed IEP was set to be implemented for the remainder of the 2011-2012 school year, which would only last another three days. (C.R. 314 (Fucci); 371 (Carlson).) The IEP, however, was not implemented for those three days as they were largely administrative, with no class instruction, (C.R. 314), and the District contended that they had not

received consent from Plaintiff to initiate such services, (C.R. 50.) Plaintiff did agree to the classification of N.A. as learning disabled and to the receipt of special education services, but not for the 2011-2012 school year. (C.R. 50; 861 (P-K).)

Typically, when a student is classified as learning disabled at such a late time in the school year, the CSE would perform its annual IEP review meeting at the same time as the initial CSE meeting to create IEPs for the current school year and the prospective school year. (C.R. 371, 374 (Carlson).) No such annual review occurred here. (*Id.*)

Plaintiff placed N.A. in the Hawk Meadow Montessori School, a private institution within the Arlington Central school district, over the summer for an eight week program. (C.R. 556 (Castle).) The program consisted of academic instruction and field trips within the community. (*Id.*) On August 20, 2012, Plaintiff wrote to the District to inform that she was unilaterally placing N.A. in Hawk Meadow and would be seeking tuition reimbursement. (C.R. 1010 (D-15).) Plaintiff thereafter requested and received transportation to and from Hawk Meadow for N.A. (C.R. 51.)

### 2. *2012 - 2013: Second Grade*

By letter dated September 7, 2012, the District informed Plaintiff that a CSE meeting was scheduled for September 12, 2012. (C.R. 1013-14 (D-16).) The CSE meeting ultimately was not held until September 28, 2012,[6] at which point the 2011-2012 IEP was amended and updated to include that N.A. would be placed at Hawk Meadow for the 2012-2013 school year. (C.R. 52; 965 (D-4).) No other changes were made. Moreover, the CSE team did not review any documentation or attempt to provide a newly created IEP for the 2012-2013 school year. Plaintiff again informed that she was consenting to the provision of special education services, but would not agree to the specific services provided. (C.R. 847 (P-F).)

---

[6] CSE annual review meetings typically occur in June of every school year to "develop an IEP for the following year." (C.R. 388.)

N.A. remained at Hawk Meadow for the entirety of his second grade year. In December of 2012, Arlington school district, the new district of location, prepared an IESP for the provision of special education services at Hawk Meadow. (C.R. 927 (P-UU).) During his time at Hawk Meadow pursuant to the IESP, N.A. was provided with occupational therapy and consultant teacher services for an hour, three times per year. (*Id.*) During this time, N.A. was also receiving tutoring at his home from Ms. Graff. (C.R. 587-89 (Graff).)

Ms. Graff testified that she also observed the environment at Hawk Meadow and noted that it was structured, made use of a "multisensory" approach to learning, and provided students with considerable one-on-one assistance. (C.R. 597.) Ms. Castle, (co-founder of Hawk Meadow) noted that the school follows the "Sequential English Education" (SEE) approach, specifically designed to address students' reading needs. (C.R. 563, 579.)

The Hawk Meadow progress reports indicate that N.A. made some progress in weak areas, including reading and writing, during his second grade year. (C.R. 914 (P-MM).) To aid in his progress, N.A. received "a lot of one-on-one" multisensory training, and was recommended to receive and did receive "copious [opportunities to] practice[] . . . , to strengthen his reading skills, math facts, and solidify all concepts being learned in the curriculum." (C.R. 914 (P-MM).) By the Spring 2013 semester, N.A.'s "writing [had] improved" and he was "beginning to use some of his spelling skills in his writing with few reminders and clues." (C.R. 915 (P-MM).)

### 3. 2013-2014: Third Grade

On June 11, 2013, the District notified Plaintiff that a CSE annual review meeting was going to be held on June 19, 2013. (C.R. 1023 (D-24).) The meeting was held and the CSE team created an IEP for the 2013-2014 school year. (C.R. 54.) The IEP provided for 15:1 special class in ELA for 90 minutes per day, 5:1 counseling 30 minutes weekly, 5:1 math resource room for 30

minutes daily, and consultant teacher services once per week for 30 minutes.  (C.R. 976 (D-5).)  The IEP also reflected the evaluations and reports that were incorporated into the June 2012 IEP which were prepared prior to N.A.'s initial classification.

While developing this IEP, the CSE team relied solely on the information that was collected prior to N.A.'s initial classification.  (C.R. 54.)  The CSE team did not have updated progress reports from Arlington or Hawk Meadow, despite repeated attempts to obtain Plaintiff's consent to acquire that information from Arlington.  (C.R. 388-89.)  Fucci attempted to again obtain Plaintiff's signature on the consent forms during the June 2013 CSE meeting, but was unsuccessful.  (C.R. 276 (Fucci).)  During the meeting, however, Fucci contacted Arlington and Hawk Meadow to see if they would participate in the CSE meeting, but both declined and informed that they would be unable to provide any information in the absence of their signed consent forms; Clarkstown consent forms would be insufficient.  (C.R. 327 (Fucci); 397 (Maher).)  Plaintiff rejected this IEP as well.  (C.R. 55.)

On August 26, 2013, Plaintiff advised that she would be unilaterally placing N.A. at Hawk Meadow for the 2013-2014 school year and would be seeking reimbursement for all costs related thereto.  (C.R. 1049 (D-29).)  Fucci contacted Plaintiff shortly thereafter informing that a CSE meeting would be held in September to review N.A.'s IEP.  (C.R. 1050 (D-30).)  On September 11, 2013, Plaintiff met with Fucci and Carlson at the District's office to discuss the potential for N.A. to attend private school.  (C.R. 295.)  No agreement was made on that date.  The District sent a CSE meeting notice to Plaintiff on September 17, 2013 for the upcoming September 18, 2013 CSE meeting.  (C.R. 1051 (D-31).)  By email, Plaintiff advised that the program offered in the June 2013 IEP was inappropriate and that she was placing N.A. at Hawk Meadow for the 2013-

2014 school year. (C.R. 1055 (D-33).) The September 18, 2013 meeting was not held and N.A. attended Hawk Meadow for the 2013-2014 school year.

### B.    IHO & SRO Decisions

As a result of Plaintiff's September 27, 2013 due process demand, an impartial hearing was conducted and concluded on July 23, 2014. Plaintiff was represented by counsel at the hearing. On March 25, 2015, the independent hearing officer issued a decision consisting of findings of fact and conclusions of law. (*See generally* IHO Opinion (C.R. 40-77).)

Ultimately, the IHO denied Plaintiff's application for full reimbursement for tuition, related expenses, and transportation to and from Hawk Meadow for the 2011-2012, and 2013-2014 school years and denied reimbursement for various other expenses sought by Plaintiff including compensatory services, but granted Plaintiff's request for tuition reimbursement for the 2012-2013 year in the amount of $14,375.00 and granted Plaintiff's request for transportation requests related to that year. (C.R. 76-77.) Specifically, the IHO concluded: 1) the District offered a FAPE for the 2011-2012 school year (first grade), 2) the District did not provide a FAPE for the 2012-2013 school year (second grade) and Hawk Meadow was an appropriate placement, and 3) the District provided a FAPE for the 2013-2014 school year (third grade). (*See generally* C.R. 63-75.)

Plaintiff sought review of the IHO's decision, and, on August 10, 2015, the State Review Officer ("SRO") affirmed the decision and denied the District's cross-appeal challenging the IHO's determination regarding the 2012-2013 school year. (C.R. 14-34.) This action ensued.

### C.    Procedural History

The Department moved to dismiss the complaint with regard to any claims asserted against the Department Defendants, while the District Defendants moved for summary judgment (ECF No. 43). Plaintiff thereafter filed a motion seeking relief under the pendency provision of the

IDEA to keep N.A. at Hawk Meadow for the 2018-2019 school year and require the District to pay the tuition costs attendant thereto. (*See* ECF No. 66.) That motion was resolved by Opinion and Order dated August 28, 2018, which granted Plaintiff's motion insofar as it sought application of the pendency law to keep N.A. at Hawk Meadow for the 2018-2019 school year and directed the District to pay for his tuition thereto. (*See* ECF No. 77.) It denied Plaintiff's request insofar as it sought retroactive reimbursement and remanded the issue to the IHO for further consideration. (*Id.*)

## LEGAL STANDARDS

### I.   Legal Framework of the IDEA[7]

The IDEA was enacted "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (quoting *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66 (1999)) (internal quotations omitted). As the Second Circuit has recently described it, this means "an education 'likely to produce progress, not regression,' and one that 'afford[s] the student with an opportunity greater than mere trivial advancement.'" *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015)); *accord Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all").

---

[7] The IDEA was amended by the IDEIA in 2004. *See E.M. v. N.Y. City Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014).

"The 'centerpiece' of the IDEA and its principal mechanism for achieving this goal is the IEP." *T.K.*, 810 F.3d at 875. "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IDEA imposes upon school districts the duty to seek out children with a disability and ensure that they receive the special education services they need (the "Child Find Obligation"). 20 USC § 1412(a)(3); 34 C.F.R. § 300.111 (a)(1)(i); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similarly, "an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451 (2d Cir. 2015). And, "an IEP must be drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)).

"The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III)). It "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting § 1414(d)(1)(A)(i)(IV)).

In addition to providing an education likely to produce progress, tailored to the unique needs of the child, the program must be offered in the least restrictive environment. 20 U.S.C.

§ 1412 (a)(5)(A); N.Y. Comp. Codes R. & Regs. §§ 200.1(cc), 200.6(a1); *see C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 467-68 (S.D.N.Y. 2015) (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013)). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with *that* student's needs, *not* the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (emphasis added and citation omitted). "This requirement 'expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted in original).

"Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." *T.K.*, 810 F.3d at 875. A school district will be required to reimburse parents for expenditures made for a private school placement, if the services offered the student by the school district are inadequate or inappropriate. *See Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 13-16 (1993); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985). Following the *Burlington/Carter* test, once a court determines that a child has been denied an appropriate educational opportunity by the public school district, the remaining considerations are "whether the parents' private placement is appropriate to the child's needs" and the balance of the equities. *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).

"Generally, 'the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness

of the parents' placement'; accordingly, the private placement must be 'reasonably calculated to enable the child to receive educational benefits.'" *Doe*, 790 F.3d at 451 (citation omitted). "Under New York law, 'the [school district] bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement.'" *T.K.*, 810 F.3d at 875 (quoting *C.F.*, 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c))).

## II.     Exhaustion Under (and Alternatives to) the IDEA

When a plaintiff initiates an action that "seek[s] relief for the denial of a [free and appropriate public education]," which is "the only 'relief' the IDEA makes 'available,'" she must follow the IDEA's exhaustion procedures regardless of whether the action is filed "under the ADA, the Rehabilitation Act, or similar laws[.]" *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 752 (2017). "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.* "[I]f, in a suit brought under a different statute, the remedy sought" is not covered by the IDEA, "then exhaustion of the IDEA's procedures is not required." *Id.* at 754 ("After all, the plaintiff could not get any relief from those procedures: A hearing officer, [lacking the power to order any relief], would have to send her away empty-handed.").

## III.    Standard of Review

In IDEA actions, the usual summary judgment considerations of whether material factual disputes exist, are not employed; rather, the court "must engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence[.]" *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385-86 (2d Cir. 2014) (internal quotations and citations omitted). That independent review, however, is not without significant limitations. "The role of the federal courts in reviewing state education decisions under

the IDEA is circumscribed." *C.F.*, 746 F.3d at 77. The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *Id.* at 77 (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). The SRO has special expertise in educational matters involving the IDEA and its decisions, when "thorough and well reasoned," are entitled to deference. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

Under this deferential review, "[w]here the IHO and SRO disagree," a federal court will "defer to the reasoned conclusions of the SRO as the final state administrative determination." *C.F.*, 746 F.3d at 77 (citation omitted). "However, where the SRO's determinations are insufficiently reasoned to merit deference," or when "considering an issue not reached by the SRO," the reviewing court "should defer to the IHO's analysis." *Id.* (citation omitted). "District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (alterations and internal quotation marks omitted).

## DISCUSSION

Plaintiff's case is nearly identical to one presented to this Court and resolved by Opinion and Order dated July 17, 2017. *See Avaras v. Clarkstown Cent. Sch. Dist.*, No. 15-CV-2042 (NSR), 2017 WL 3037402 (S.D.N.Y. Jul. 17, 2017) (the "2017 Case"). Indeed, the causes of action raised in the Second Amended Complaint (the "SAC") are identical to those raised in the 2017 Case, with the exception that the 2017 Case pertained to Plaintiff's other child, A.A. As this Court did in that case, premised on alleged violations of the IDEA, the Rehabilitation Act, the ADA, and Section 1983, it begins with an assessment of the IDEA claims.

## I.    <u>IDEA Claims</u>

Plaintiff's IDEA claims are only properly asserted against the District Defendants.[8] Furthermore, this Court can only review claims that are exhausted, meaning they were brought to the state agency for its consideration.  In New York, a plaintiff must engage in the state's "two-tier administrative system for review of IEPs": first, she must seek review by an independent hearing officer; and second, she must appeal any adverse result to a state review officer.  *See Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008); *see also B.C. ex rel. B.M. v. Pine Plains Cent. Sch. Dist.*, 971 F. Supp. 2d 356, 365 (S.D.N.Y. 2013) ("a plaintiff's failure to satisfy the IDEA's exhaustion requirement deprives the Court of subject matter jurisdiction"); *Myslow v. New Milford Sch. Dist.*, No. 03 Civ. 496 (MRK), 2006 WL 473735, at *12 (D. Conn. Feb. 28, 2006) (only IDEA claims related to an IHO's explicit findings, appealed to the SRO as necessary, are appropriately exhausted).

Comparing the appeal to and decision by the SRO with the IHO's decision in response to Plaintiff's due process request, it is apparent that there are two fully exhausted issues: (1) whether N.A. received a FAPE during the 2011-2012, 2012-2013, and 2013-2014 school years; and (2) whether his unilateral placement at Hawk Meadow beginning in the 2011-2012 school year was appropriate.  These are the only IDEA claims, ripe for review, over which this Court has jurisdiction.

---

[8] As she did in the 2017 Case, Plaintiff asserts claims against the Department.  For primarily the same reasons this Court articulated in the 2017 Case, the claims against the Department under the IDEA are dismissed with prejudice. *See Avaras*, 2017 WL 3037402, at *12 n.16 (noting that "the State Education Department—which is not responsible for the day-to-day formulation of students' IEPs—is not the proper party to a suit challenging an administrative determination as to the sufficiency of the IEPs provided by the local education agency"); *see also Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir. 2002).  For the same reasons, to the extent Plaintiff's SAC alleges an IDEA claim against the Department Officials, such a claim must also be dismissed.

### A. Whether N.A. was Denied A FAPE in 2011-2012, 2012-2013, 2013-2014 and his Placement in Hawk Meadow was Appropriate

The Court must now review the claims that the IHO & SRO agreed upon to determine if the state review process is undeserving of deference—that is, whether those decisions are against the preponderance of the evidence, keeping in mind the SRO's special expertise in educational matters.

#### 1. *Whether N.A. Was Offered a FAPE During the 2011-2012 School Year*

The IHO and SRO both found that N.A. was offered a FAPE for his first year. (C.R. 14-19; C.R. 63-71 (IHO).) Plaintiff argues both procedural and substantive challenges to the IEP developed for the 2011-2012 school year.

"[T]he [IDEA] guarantees [] an *appropriate* education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks and citation omitted) (emphasis added). As for the appropriateness of the education provided, "[t]he IDEA demands . . . an educational program reasonably calculated to enable a child to make progress appropriate in light of th[at] child's circumstances." *Endrew F.*, 137 S. Ct. at 1001.

#### a. *Whether the District violated its Child Find Obligation*

The IDEA creates a "Child Find" obligation, "which is a[n affirmative] duty to identify, locate, and evaluate children who are suspected of having a disability and who are in need of special education and related services." *R.E. v. Brewster Centr. Sch. Dist.*, 180 F. Supp. 3d 262, 268 (S.D.N.Y. 2016) (citing *A.P. v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221 (D.Conn. 2008)). Toward that end, states are required to "have in effect policies and procedures" to meet this obligation. *W.A. v. Hendrick Hudson Centr. Sch. Dist.*, 219 F. Supp. 3d 421, 456 (S.D.N.Y. 2016) (quoting 20 U.S.C. § 1412(a)) (internal alterations omitted). Where a school board "violates its

Child Find obligation by not evaluating a child suspecting of being disabled, it necessarily fails to provide that student a FAPE." *Id.* (quoting *Greenwich Bd. of Educ. v. G.M.*, No. 13-CV-235, 2016 WL 3512120, at *8 (D.Conn. June 22, 2016)) (internal quotations omitted).  Nevertheless, to find a violation, a "District must have 'overlooked clear signs of disability' or been 'negligent in failing to order testing', or there must have been 'no rational justification for not deciding to evaluate.'" *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 661 (S.D.N.Y. 2011); *see also Mr. P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018) (quoting *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307 (6th Cir. 2007)).

Plaintiff's position is that the District violated its Child Find obligation when it provided N.A. with RTI services for most of his kindergarten (beginning in November of 2010, (*see* C.R. 43, 447, 191-94) and first grade years, and did not evaluate him for special education services until she requested such an evaluation in May of 2012, (*see* Plf. Resp. ¶4.)  The IHO determined that the District did not violate its Child Find obligation, as it had procedures in place for meeting this obligation, gave N.A. RTI services, believed he was progressing during those services, and promptly performed an evaluation when Plaintiff requested it.  (*See* C.R. 66-68.)  The SRO agreed with this assessment for substantially the same reasons.  (*See* C.R. 16-18.)  Though any claims Plaintiff attempts to present regarding whether or not the District provided N.A. a FAPE for the 2010-2011 school year (kindergarten) are likely untimely, and in any event unexhausted, the events regarding his RTI services provided that year may nevertheless illuminate whether the District violated its Child Find obligation.  *See Mr. P.*, 885 F.3d at 750.

Though the IHO & SRO both concluded that there was no Child Find violation, this Court reaches a different result.  *See M.H.*, 685 F.3d at 244 (noting that determinations regarding procedural violations are regarded less deference).  The IHO & SRO based their determination on

the fact that the District identified N.A. as in need of extra help early in his kindergarten year, (*see* C.R. 16, 67), had procedures in place for identifying such students, (*id.* at 66), and that he made progress during his time receiving RTI services, (*id.* at 16, 68.) Nevertheless, the law is clear: the Child Find obligation "extends to all children suspected of having a disability requiring special education, 'even though they are advancing from grade to grade,'" *Mr. P.*, 885 F.3d at 749, and a "school district must begin the evaluation process within a reasonable time after the district is on notice of a likely disability," *id.* (*See also* C.R. 65 (citing law that "[a] district's child find duty is triggered when there is 'reason to suspect a disability and reason to suspect that special education services may be needed to address that disability'").) That did not occur here. Instead, the District provided RTI services for N.A. for the majority of both his kindergarten and first grade years, apparently believing that his ability to "advance from grade to grade" was sufficient an excuse not to refer him for evaluation.

The weight of the evidence demonstrates that the District violated its Child Find obligation. First, the District overlooked clear signs of a disability, particularly in light of, even the IHO's determination that, after receiving RTI services for the majority of his kindergarten year, N.A. was referred again for such services in his first grade year as he was "continu[ing] to struggle." (C.R. 67.) Moreover, the witnesses testified that RTI services run on eight week cycles, (*see* C.R. 385 (Maher), C.R. 419 (Grant)), and contain several levels of intensity based on the needs of the child, (*id.* at 331 (Fucci).) Nevertheless, N.A. received RTI services, proceeding all the way through Tier 3 intervention, for approximately seven months in kindergarten as well as nine months in first grade, before he was referred to an evaluation. (*See* C.R. 43, 447, 191-94.) Though the testimony demonstrates that N.A. did make some progress during that timeframe, (*see* C.R. 387 (Maher), 422 (Grant)), such a finding is untenable as a reasonable justification for not evaluating N.A.; the

duty to evaluate, at the very least, was triggered 8 weeks after N.A. started Tier 3 services in first grade,[9] *see M.N. v. Kathonah-Lewisboro Sch. Dist.*, No. 14-CV-3845 (KMK), 2016 WL 4939559, at *14 (S.D.N.Y. Sept. 14, 2016) (collecting cases holding that period in excess of six months constituted violation of Child Find). Indeed, it was not until Plaintiff specifically requested the evaluation that the District sought her consent and performed it. (C.R. 45; 987-88.)

By the time the evaluation was performed, and a CSE meeting held, the entirety of Plaintiff's first grade year, except for three (largely administrative) days, had passed. (C.R. 50.) This Court finds that the District violated its Child Find obligation.

To the extent such a procedural violation exists, a plaintiff is only entitled to relief if the violation: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the partners' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." *Mr. P.*, 885 F.3d at 748. Accordingly, a parent "must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affect the decision-making process." *Id.* at 748-49 (quoting *M.W.*, 725 F.3d 131).

It is evident that the District's apparent abandonment of their obligation to identify *and evaluate* N.A. for eligibility to receive special education instruction, certainly "caused a deprivation of educational benefits." As indicated above, and acknowledged by the IHO & SRO, after N.A.'s evaluations in June of 2012, he was classified as learning disabled and therefore entitled to special education services, (C.R. 50), and an IEP was developed on June 19, 2012, but was not implemented because "the remaining 2-3 days of school did not include academic

---

[9] Fucci explicitly testified that after a student is provided with Tier 3 RTI services, upon an evaluation (which was said to have occurred every eight weeks (*see* C.R. 385 (Maher), C.R. 419 (Grant)), "[i]f [the student is] not meeting needs at that point, the school may make a school referral, and request from the parent consent to evaluate for a full psychoeducation, and make a referral to the Committee on Special Education," (C.R. 331.)

instruction . . . ," (*id.*)  Had the District sought an evaluation toward the beginning of N.A.'s first grade year, it would have determined, as it inevitably did, that N.A. should be classified as learning disabled and entitled to certain specialized education benefits and services.  Moreover, the fact that he was given RTI services and apparently progressed through implementation of these services does not change the result; as District members testified, RTI services are *not* special education services, and are only given prior to classification.  (*See* C.R. 42, 330-31 (Fucci), 375 (Carlson) (N.A. was not on his radar for CSE purposes prior to May 2012).)  As an evaluation was not performed within a reasonable time frame from the District' notice of N.A.'s potential disability, he was deprived of the opportunity to obtain special education services earlier in his education. Consequently, this Court finds that N.A. was denied a FAPE for his 2011-2012 school year.

As Plaintiff did not unilaterally place N.A. in Hawk Meadow until the summer of 2012, after his first grade year concluded, this Court need not ascertain whether she is entitled to reimbursement for the 2011-2012 school year.

   2.   *Whether the District Provided N.A. a FAPE for the 2012-2013 School Year*

Prior to N.A.'s 2012-2013 school year, in June of 2012, Plaintiff placed N.A. in a summer program at Hawk Meadow.  (C.R. 555-556.)  N.A. has been attending Hawk Meadow ever since. With respect to his second grade year, the IHO & SRO both found that the District failed to provide N.A. with a FAPE.  (*See* C.R. 19; C.R. 71-72.)  Specifically, the IHO & SRO both found that the District did not have an IEP in place for the beginning of the 2012-2013 school year.  This Court agrees.

In fulfilling their obligation to create an IEP that is tailored to the individual student's needs, "a school district must [] ensure that a child's IEP is *in effect* at the *beginning* of the school year."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 185, 194 (2d Cir. 2005); *see K.L. v. N.Y.C.*

*Dep't of Educ.*, No. 11-CV-3733 (KBF), 2012 WL 4017822, at *16 (S.D.N.Y. Aug. 23, 2012) (citing 34 C.R.F. § 300.323(a)) (emphasis added).

Simply put, the testimony by Carlson, the CSE chairperson, demonstrated that: (1) an IEP was created in June 2012; (2) that IEP was *not* developed to cover the 2012-2013 school year; and (3) it was only developed to cover the remaining three days of the 2011-2013 school year. (*See* C.R. 371 (Carlson).) Additionally, he testified that, in situations like N.A.'s, where a classification is made late in a school year, the CSE committee would "hold an annual review meeting at the same time" as the initial CSE meeting, but that such annual review was not held in this situation. (C.R. 374 (Carlson).) Moreover, the evidence demonstrates that an IEP was not developed until September 28, 2012, after the school year had already commenced. (C.R. 965 (D-4).) This Court finds the IHO & SRO determinations were well reasoned and supported by the preponderance of the evidence; the District failed to provide a FAPE for the 2012-2013 school year. *See Davis v. Wappingers Centr. Sch. Dist.*, 431 F. App'x 12, 15 (2d Cir. 2011) (summary order) (upholding IHO & SRO's finding of no FAPE based on failure to have in place an IEP at the beginning of the school year).

To the extent the District Defendants argue that they were not required to develop an IEP for the 2012-2013 school year because they had not obtained "informed consent" from Plaintiff to initiate special education services, the Court is unpersuaded. While the IHO and SRO did not address this argument, the IHO explicitly found that Plaintiff had rejected the IEP that was developed for the 2011-2012 year, but otherwise agreed to the initial provision of services for N.A. for the 2012-2013 year. (C.R. 126; 861 (P-K).) In light of these facts, the District was not relieved of its obligation to provide an IEP for the 2012-2013 year. *See Doe*, 790 F.3d at 451 n.9 (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1529 (9th Cir. 1994) for the proposition that District

cannot escape obligation "by arguing that a disabled child's parents expressed unwillingness to accept that placement"). Such a finding is further bolstered by Plaintiff's following consent form, (C.R. 1019 (D-21)), which explicitly included Plaintiff's consent to N.A.'s classification and the receipt of services, just not the ones offered by the District.

Moreover, the District's argument that Plaintiff had already placed N.A. in Hawk Meadow, indicating no real interest in having him educated within the district is equally unavailing. "A local educational agency's duty to provide a FAPE is not ended by enrollment of a resident child in a private school outside the district." *Doe*, 790 F.3d at 450. Therefore, despite his placement at Hawk Meadow, N.A. was entitled to an IEP designed by the District and "reasonably calculated to enable [him] to make progress appropriate [to his] circumstances." *Endrew F.*, 137 S. Ct. at 1001.

### 3. *Whether the District Provided a FAPE for the 2013-2014 Year*

With regard to N.A.'s 2013-2014 (third grade) school year, the IHO & SRO both found that the District provided a FAPE. (*See* C.R. 29-31; 72-73.) This Court must afford deference to the SRO's determinations, particularly where it relates to a substantive determination about the adequacy of an IEP, *M.H.*, 685 F.3d at 244 (noting that "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures"); as such, this Court adopts the IHO & SRO's determinations that, the District's development of the June 2013 IEP was based on the information it had at the time (which, coincidentally was as recent as June 2012). (C.R. 31 (noting that "the June 2013 CSE had sufficient information on which to develop the IEP (despite the absence of updated information)). Moreover, the Court adopts the SRO & IHO's determinations that the District's lack of updated information resulted from Plaintiff's inability to provide the

appropriate consent forms necessary for the District to obtain progress reports and evaluative data from Hawk Meadow. (C.R. 29-30; 72-74.)

In assessing whether the 15:1 special education, along with the other programs, was the least restrictive environment,[10] the SRO noted that N.A.'s instruction in the 15:1 special education classroom would not constitute the entirety of his education, or even the majority of it, (C.R. 33), and that, in addition to the 15:1 classroom setting, he would be provided with 30 minute resource room daily, at a 5:1 ratio, 30 minute counseling services weekly, at a 5:1 ratio, and consultant teacher services for 30 minutes per week, (C.R. 976.) The balance of his time would have been spent in general education classes.

The IDEA states a clear preference for mainstreaming students with disabilities: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are [to be] educated with children who are not disabled[.]" 20 U.S.C. § 1412(a)(5)(A). Thus, "the presumption in favor of mainstreaming [is] weighed against the importance of providing an appropriate education to [] students" with disabilities, *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008) (citation omitted), in cases where "education in regular classes . . . cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A) ("only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" is it appropriate to use "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment").

---

[10] Plaintiff did not argue that the 15:1 special education classroom was not appropriate to address N.A.'s needs; she only argued that such a program is *not* the least restrictive environment. (C.R. 31.) As the SRO explicitly acknowledged that Plaintiff did not raise this issue, this Court does not consider whether the IEP was tailored for N.A.'s unique needs, as it apparently was not in dispute. (C.R. 21-22 (noting that N.A.'s needs were not in dispute).) *C.f. D.N. v. N.Y.C. Dep't of Educ.*, 905 F. Supp. 2d 582, 589 (S.D.N.Y. 2012) (remanding back to SRO to consider whether IEP addressed student's sensory needs, as it was raised by parent and IHO but not considered by SRO).

The decision by the IHO, affirmed by the SRO, that N.A. was placed in the least restrictive environment, is supported by the testimony. "The school must aim to minimize the restrictiveness of the student's environment while also considering the educational benefits available in that environment, 'seek[ing] an optimal result across the two requirements.'" *T.M.*, 752 F.3d at 162 (quoting *M.W.*, 725 F.3d at 145). The District's witnesses testified that, when the IEP was originally produced in June of 2012 (as the June 2013 IEP was largely the same), they considered the parents' concerns for additional services outside of the 15:1 special education classroom, and therefore added consultant teacher services. (C.R. 371-72; 381 (noting that they switched his math needs from 15:1 to 5:1, to have "a small group instruction resource room, combined with consultant teacher indirect, so he could be educated in the General Ed setting, but get reinforcement and remediation and teacher support when needed").) *See, e.g.*, *M.F. v. Irvington Union Free Sch. Dist.*, 719 F. Supp. 2d 302, 309 (S.D.N.Y. 2010) (student's "educational program for the [upcoming] school year was changed from a self-contained setting to consultant teacher services because it appeared to the school psychologist . . . that [his] 'availability to learning was actually greater in the larger classroom setting'" and his "decoding problems were adequately addressed by the CSE's recommendation to enroll [him] in a daily developmental reading class with . . . a certified reading specialist").

"In order to comply with the LRE requirement, . . . a school district must consider an appropriate continuum of alternative placements, and then must offer the student the least restrictive placement from that continuum that is appropriate for the student's disabilities." *T.M.*, 752 F.3d at 163. Here, N.A. was not placed solely in a self-contained classroom with no non-disabled students or without the beneficial social interactions necessary; he was provided more and given the opportunity to remain integrated in general education. As the District made such

accommodations here, and importantly, their development with respect to the 2013-2014 IEP had to be limited to their information from the prior year as they did not have the benefit of the Branieki report or any progress reports from Hawk Meadow to include a provision for 1:1 instruction, the Court agrees that the IHO & SRO's determinations are supported by the record evidence.

## B. Whether Plaintiff's Unilateral Placement of N.A. at Hawk Meadow During the 2012-2013 School Year Was Appropriate

The IHO & SRO properly concluded that Hawk Meadow was an appropriate placement. In disputing this determination, the District Defendants focus on the fact that there was no evidence that "Hawk Meadow staff was sufficiently trained to teach N.A. at all, let alone provide him with special education services." (*See* Dist. Defs. Br. at 18.) This Court disagrees.

A private placement is appropriate if it is "reasonably calculated to enable the child to receive educational benefits," *C.F.*, 746 F.3d at 82 (quotation marks omitted), "such that the placement is likely to produce progress, not regression," *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014) (quotation marks omitted). "In determining whether a placement reasonably serves the educational needs of a child with a disability and is likely to produce progress," a reviewing court may consider the "totality of the evidence, including 'grades, test scores, regular advancement, or other objective evidence.'" *T.K.*, 810 F.3d at 877; *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 770-71 (6th Cir. 2001) (unilateral private placement appropriate where, *inter alia*, class sizes were small, the student made significant educational progress, and his grades and behavior improved significantly). But "[n]o one factor is necessarily dispositive[.]" *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006).

The test for the private placement "is that it is appropriate, and not that it is perfect." *C.L.*, 744 F.3d at 837 (quotation marks omitted). In fact, parents bear a lower burden with regard to

demonstrating the appropriateness of a private placement than school districts do when demonstrating the adequacy of the educational opportunity provided because "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free and appropriate public education." *Frank G.*, 459 F.3d at 364. "To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential," *id.* at 365.

Importantly, "[a]n appropriate private placement need not meet state education standards or requirements" or "provide certified special education teachers or an IEP for the disabled student." *Doe*, 790 F.3d at 451 (quoting *Frank G.*, 459 F.3d at 364). Consequently, to the extent the District Defendants' argument rests on the fact that Hawk Meadow does not meet state standards, such argument is not based in law.

Hawk Meadow provided N.A. with several benefits unavailable to him in the District's IEPs, including small class sizes, 1:1 instruction, integrated student environments, and a multisensory approach to learning.[11] (C.R. 563.) While it is still an open question as to whether small class sizes—"the kind of educational and environmental advantage[] . . . that might be preferred by parents of any child, disabled or not," *Doe*, 790 F.3d at 452 (quoting *Gagliardo*, 489 F.3d at 115)—on their own are sufficient to make an alternative placement more appropriate than a school district's offering, N.A. received other benefits rendering Hawk Meadow appropriate. *Compare Frank G.*, 459 F.3d at 365-66 ("We need not decide that small class size alone rendered the [alternative] placement appropriate because [the student's] teacher at [the school] adapted her instruction to meet his needs"), *with Doe*, 790 F.3d at 452, *cert. denied*, 136 S. Ct. 2022 (2016), *reh'g denied*, 136 S. Ct. 2546 (2016) (alternative placement "school did not offer any special

---

[11] Both Ms. Graff and Dr. Braniecki testified to the importance of a multisensory approach and the benefits of a smaller class size—emphasizing the need for one-on-one instruction when it came to reading support.

education services and did not modify its curriculum to fit the Student"). Indeed, the record demonstrates that N.A. had portions of the curriculum tailored to his needs specifically, (C.R. 559, 563-64), and became more open about school after attending Hawk Meadow, (C.R. 559.)

During N.A.'s 2012-2013 school year, Ms. Graff also acted as a tutor for N.A. in connection with an additional teaching certification program she was completing, (C.R. 587-89 (Graff)), and she testified that Hawk Meadow was very structured, was using a "multisensory" approach based on the "Orton-Gillingham" model in teaching N.A., and provided critical one-on-one assistance to N.A. and other struggling students. (C.R. 597.) Moreover, the fact that he received these benefits is in line with Dr. Braniecki's recommendation that he would benefit from "a multisensory approach to learning where he receives much support" including a 1:1 help in reading. (C.R. 1032.)

Moreover, Ms. Castle testified the school followed the "Sequential English Education" (SEE) approach, specifically designed to address students' reading needs. (C.R. 563, 579.) During his time at Hawk Meadow, N.A. was provided opportunities to have "copious practices . . . to strengthen his reading skills, math facts, and solidify all concepts being learned in the curriculum." (C.R. 914 (P-MM).) As a result, by the Spring 2013 semester, N.A.'s "writing [] improved" and he was "beginning to use some of his spelling skills in his writing with few reminders and clues." (C.R. 915 (P-MM).) In short, it appears N.A. was making progress in the critical areas in which he previously struggled, even if such progress did not constitute "significant gains". (C.R. 26.)

"[A]ssessment of educational progress is a type of judgment for which the district court should defer to the [administrative hearing officer's] educational experience." *Doe*, 790 F.3d at 451 (quoting *Frank G.*, 459 F.3d at 367 (internal quotation marks omitted)). Here, the IHO and SRO concurred that N.A. showed some progress as a result of his tutelage at Hawk Meadow. (*See*

C.R. 75; C.R. 26-27.) This Court agrees and finds that, in consideration of the foregoing, a determination that Hawk Meadow was an appropriate placement is supported by the weight of the evidence.

### C. Whether the Equities Favor Reimbursement

Having determined that the District did not provide N.A. with an appropriate educational opportunity for second grade (2012-2013)[12] year and that Hawk Meadow was an appropriate alternative placement designed to address his particular learning needs, the next necessary determination pursuant to the *Burlington/Carter* test is whether a balance of the equities favors reimbursement. *See Burlington*, 471 U.S. at 374. Specifically, "equitable considerations relating to the reasonableness of the action taken by the parents", must favor Plaintiff. *C.F.*, 746 F.3d at 82. Here, the IHO and SRO both determined that the equities favored Plaintiff. (C.R. 27-29; 75-76.)

The District Defendants argue to the contrary, insofar as Plaintiff failed to provide the requisite consents and statutory 10-day notice for unilateral placement in a timely fashion. (*See* Dist. Defs. Br. at 22-23.) The SRO rejected both of these arguments below on the grounds that the hearing record demonstrated that, though Plaintiff may not have provided the consents in a timely fashion, she did make it clear that she consented to the receipt of special education services, and did not frustrate the CSE process. (C.R. 28.) With respect to the 10-day notice rule, the SRO held that the IDEA permits the denial or reduction of reimbursement if parents "do not provide notice of the unilateral placement either at the most recent CSE meeting prior to removing the

---

[12] As indicated above, the Court also finds that no FAPE was provided during N.A.'s 2011-2012 (first grade) school year, but as the parents did not unilaterally place N.A. at Hawk Meadow until the end of the 2011-2012 school year, there is nothing to reimburse.

student from public school, or by written notice 10 business days before such removal," but reduction or denial of reimbursement rests within the discretion of the SRO. (C.R. 28.)

Moreover, the SRO acknowledged that, while Plaintiff failed to provide the requisite notice at the June 2012 CSE meeting before placing N.A. in Hawk Meadow for the summer, she did provide such notice in August of 2012, prior to the 2012-2013 school year. (C.R. 29.) To account for such noncompliance, the SRO concluded that it would use its discretion to limit reimbursement to the "10-month portion of the 2012-2013 school year. (C.R. 29.) This Court finds no reason to deviate from the SRO's determination.

## II.    Other Claims

Having addressed the vast majority of Plaintiff's claims in the preceding IDEA review, the Court now turns to her remaining claims. A review of the operative complaint indicates that she is also attempting to plead claims under the ADA, the RA, and § 1983. (*See* SAC at 7.)

### A.    Inapplicability of the IDEA's Exhaustion Requirements

The District Defendants again argue, as they did with regard to the 2017 Case, that Plaintiff's non-IDEA claims are ripe for dismissal for failure to exhaust. (*See* Dist. Defs. Br. at 23-24.) This Court reaches the same result now that it did in the 2017 Case; exhaustion is not required. *See Avaras*, 2017 WL 3037402, at *25-26. Consequently, the Court only addresses this issue in brief.

"[E]ven when the suit arises directly from a school's treatment of a child with a disability— and so could be said to relate in some way to [the child's] education"—if the hearing officer could not have offered Plaintiff the relief she sought on these claims, then exhaustion is inapplicable. *Fry*, 137 S. Ct. at 754.

The *Fry* court posed a two question inquiry: (1) would the claim be viable against "a public facility that was *not* a school," and (2) could an adult rather than a student make the same claim against the school? *Id.* at 756. Negative answers suggest the complaint revolves around the IDEA and that the exhaustion requirements apply. *Id.* "In short, the IDEA guarantees individually tailored educational services, while [the ADA] and [RA] promise non-discriminatory access to public institutions." *Id.* at 756.

As with her claims in the 2017 Case, here Plaintiff alleges, as to the Department, that it abdicated its oversight responsibilities and failed to ensure school districts were in compliance with applicable law. (SAC at 4-5, 7.) She also alleges that it took an "entire year" to obtain N.A.'s "complete case record". (*Id.* at 4.) In terms of relief, she seeks compensatory and punitive damages, as well as an audit of the Department. (*Id.* at 8.) She alleges that N.A. was denied a free and appropriate public education, as well as injuries unrelated to such a denial including psychological, emotional, and financial injury to herself and N.A. (*Id.* at 7.)

Plaintiff unquestionably exhausted all facets of her IDEA claim that the Court addressed above; to the extent any claims are duplicative of her IDEA claims, they have been addressed. The portion of these claims that overlap with the IDEA—*i.e.*, those that complain of N.A.'s educational experience and seek tuition reimbursement or related monetary damages—and which were not raised with the IHO and SRO cannot be raised for the first time in this Court. (*See* Am. Compl. 1 (potentially alleging claims regarding the 2010-2011 school year).) Nevertheless, at least two forms of relief Plaintiff seeks are not available under the IDEA, such as lost wages and punitive damages. To the extent any of her non-IDEA claims are viable, addressed below, they are not subject to the IDEA's exhaustion requirement.

### B.    The Department's Motion to Dismiss

To the extent that Plaintiff seeks monetary damages against the Department under the IDEA, whether for compensatory or punitive damages, such damage claims cannot be brought under the IDEA and must be dismissed, as detailed *supra* n. 8.  *See also Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir. 2002).  Moreover, as discussed above, the Department is not a proper or necessary party to Plaintiff's IDEA claims.  Absent specific allegations of violations of federal and state law by the Department that may have led to procedural deficiencies at the district, IHO or SRO levels—allegations which are not present here—such an action cannot be brought against the Department.  *See, e.g.*, *Yamen by Yamen v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 909 F. Supp. 207, 211 (S.D.N.Y. 1996) ("complaint contain[ed] no allegation of any action or practice on the part of the State defendants . . . that may have led to the alleged procedural deficiencies at the district level, the impartial hearing or before the State Review Officer").

The Department also properly points out that, to the extent Plaintiff is asserting any type of claim against Carol Hauge, such claims fail as a matter of law.  (*See* Dep't Supp. Br. at 6.)  Ms. Hauge was the IHO that presided over Plaintiff's administrative proceedings and is therefore entitled to absolute immunity.  *See* ); *B.J.S. v. State Educ. Dep't/Univ. of N.Y.*, 699 F. Supp. 2d 586, 593-95 (W.D.N.Y. 2010) (noting that "absolute immunity has been extended 'to certain others who perform functions closely associated with the judicial process' including 'administrative officials exercising independent quasi-judicial powers"), *report and recommendation adopted* 815 F. Supp. 2d 601 (2011); *R.S. v. Bd. of Educ. Shenendehowa Cntr. Sch. Dist.*, No. 17-CV-0501 (LEK/CFH), 2017 WL 6389710, at *3 (N.D.N.Y. Dec. 13, 2017) (dismissing claims against SRO on basis of absolute immunity).

Plaintiff's only potential recourse is to state a claim against the Department Officials for violations of their general supervisory liability in violation of the IDEA. Toward that end, it is true that a "[s]tate may not abdicate wholesale its oversight duties." *See C.L. v. Hastings-on-Hudson Union Free Sch. Dist.*, No 14-CV-4422 (NSR), 2015 WL 1840507, at *5 (S.D.N.Y. Apr. 21, 2015). This Court has previously denied such claims, where, as here, a Plaintiff fails to allege systematic failures within the District or that actual notice was provided to the state defendants regarding such failure. *Id.* at 5-6. The allegations Plaintiff makes with respect to this claim are threadbare. Specifically, she alleges: (1) that the Department Officials "are responsible for oversight and implementation of policy, support services, and quality assurance . . . ," (*see* SAC at 5); and (2) that in "2011, NYSED put district CCSD on notice and it was listed as a 'district in need of improvement' with regard to their special ed services", (*id.*)

While Plaintiff's allegations indicate that the SED had actual knowledge of the District's failures, evidence provided by the Department Defendants, that is publicly available on the SED's website and therefore judicially noticeable, indicate that such failings pertained to one high school and one middle school during one year (2011-2012), which were ultimately addressed and remedied. (*See* Dep't Defs. Br. 10-11; *see also* Declaration of Mark E. Klein in Support of the Department Defendants' Motion ("Klein Decl.") (ECF No. 58), Ex. H at 4.) Consequently, the record evidence demonstrates the alleged failures were, as a matter of law, not "systematic" as required by the case law and "undercuts the notion that the State was on notice of a systemic problem . . . ." *C.L.*, 2015 WL 1840507, at 6. Such claims must therefore be dismissed.

Additionally, to the extent Plaintiff attempted to assert any claims against the Department Officials for violations of the ADA, the Rehabilitation Act, or Section 1983, those claims are ripe for dismissal as well. *See C.L.*, 2015 WL 1840507, at *6 (noting that "[c]ourts routinely dismiss

claims brought under Rehabilitation Act Section 504 and the ADA when IDEA claims are dismissed on the same grounds"). Moreover, the Department Defendants sought dismissal of these claims in their supplemental moving papers, and Plaintiff failed to address their arguments at all. Consequently, the claims are otherwise deemed abandoned.

Therefore, the only potential non-IDEA claims that may be asserted are those against the District under the ADA and RA, which are addressed below.

1. *Claims under the ADA, RA, and § 1983 against the District and the Department*

i. *The ADA and RA*

Plaintiff's claims allegedly brought pursuant to the ADA and RA are largely duplicative of her IDEA claims—and seek the same relief. However, to the extent that some of the claims are distinguishable either because they seek relief unavailable under the IDEA or because they address specific acts of discrimination beyond simply the denial of a free and appropriate public education, the Court considers whether any of the claims are plausibly alleged.

A plaintiff seeking to establish a prima facie case of discrimination under either the ADA or the RA must allege facts sufficient to establish that: "(1) plaintiff is a 'qualified individual with a disability;' (2) plaintiff was 'excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity;' and (3) such exclusion or discrimination was due to [plaintiff's] disability.'" *B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)); *see Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15 Civ. 5432 (NSR), 2016 WL 6901314, at *9 (S.D.N.Y. Nov. 18, 2016) ("the same legal standards govern the disability provisions of the ADA [and] RA").

The first consideration, however, is not automatically established by a student receiving special education services under the IDEA. "[T]he ADA and IDEA set forth distinct legal standards in their definitions of 'disability,' such that an individual will not qualify for the ADA's protections simply by virtue of his or her disabled status under the IDEA." *B.C.*, 837 F.3d at 160. "[A] child might 'need[ ] special education and related services' by reason of an impairment," as required by the IDEA, "even if that impairment does not 'substantially limit[] . . . [a] major life activit[y],'" the definition of a disability under the ADA. *Id.* at 159 (*comparing* 20 U.S.C. § 1401(3)(A), *with* 42 U.S.C. § 12102(1)(A)). Thus, "[t]hose seeking relief pursuant to ADA or Section 504 must come forward with 'additional evidence'—beyond simply their eligibility for IDEA coverage—showing their eligibility for the remedies afforded by the ADA and Section 504." *Id.* at 161. As with her 2017 Case, Plaintiff has offered no allegations separate from those supporting his IDEA claims that would allow the Court to infer that N.A. is limited in a major life function such that he would qualify as disabled under either statute.

Even if she had, as this Court reasoning in the 2017 Case, where, as here, the gravamen of the complaint is the denial of a free and appropriate public education, "there must be [at least allegations] that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with 'bad faith or gross misjudgment.'" *Avaras*, 2017 WL 3037402, at *27 (quoting *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010); *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) ("Where a plaintiff asserts denial of a free appropriate public education . . . , plaintiff must demonstrate bad faith or gross misjudgment."); *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005) (noting that a Rehabilitation Act claim may be brought if "a school

district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE")).  No such allegations are raised.

Therefore, Plaintiff's claims against the District must be dismissed for failing to adequately allege that N.A. was "excluded from any programs, denied benefits, or otherwise discriminated against *on the basis of his disability*."  *A.G. on behalf of J.G. v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, No. 16 Civ. 1530 (VB), 2017 WL 1200906, at *12 (S.D.N.Y. Mar. 29, 2017) (citation omitted).  The District's motion is granted in this regard.

### ii.  *Section 1983*

To the extent that Plaintiff is seeking to assert claims against the District pursuant to Section 1983, such claims also fail.  Having availed herself of the administrative review process, Plaintiff is not entitled to pursue a damage claim pursuant to § 1983 without plausibly alleging she was denied the procedural safeguards to which she was entitled under the IDEA.  *See Streck*, 280 F. App'x at 68 ("plaintiffs may not rely on § 1983 to pursue monetary damages for violations of the IDEA" where "they were afforded a hearing before an impartial hearing officer and review by a state review office").

**CONCLUSION**

For the foregoing reasons, the District Defendants' motion for summary judgment is GRANTED in part and DENIED in part, and the Department's motion to dismiss is GRANTED. All of Plaintiff's non-IDEA claims are dismissed. As for Plaintiff's IDEA claims, the Court finds that 1) N.A. was denied a free and appropriate public education for the 2011-2012 and 2012-2013 school years, and 3) Hawk Meadow was an appropriate alternative for N.A. in light of his unique educational needs.

The Clerk of the Court is respectfully requested to terminate the pending motions at ECF Nos. 43 & 53 and to close the case. The Clerk of the Court is also directed to mail a copy of this Opinion and Order to Plaintiff at her address as listed on ECF.

Dated:     September 28, 2018                                         SO ORDERED:
          White Plains, New York

                                                  NELSON S. ROMÁN
                                       United States District Judge